# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:04CR518 |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| LANCE A. COFFER, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion of defendant Lance A. Coffer (Coffer) to suppress (Filing No. 13). Coffer seeks to suppress evidence seized from Coffer by law enforcement officers on August 2, 2004, at the Greyhound Bus Depot in Omaha, Nebraska, and to suppress Coffer's statements to law enforcement officers made on that same day. Coffer is charged in the Indictment with a conspiracy to distribute and possess with intent to distribute more than 500 grams of cocaine during August 2004 (Count I) in violation of 21 U.S.C. § 846 and the possession with intent to distribute in excess of 500 grams of cocaine (Count II) in violation of 21 U.S.C. § 841(a)(1).

An evidentiary hearing was held on the motion on February 11, 2005. At the hearing, the court heard testimony from Investigator Richard Lutter (Investigator Lutter) of the Nebraska State Patrol (NSP) and Cornell Kennedy (Mr. Kennedy). The court also received into evidence an advice of rights form (Exhibit 1) and a videotape of the interview of Coffer (Exhibit 2). A transcript of the hearing (TR.) was prepared and filed on February 19, 2005 (Filing No. 23).

## FINDINGS OF FACT

NSP Investigator Lutter is assigned to the commercial interdiction unit which looks for persons transporting illegal contraband, including narcotics, weapons, and currency through the use of commercial forms of travel, such as by bus, train, or airplane (TR. 9). On August 2, 2004, Investigator Lutter along with NSP Investigators Scott and Plowman were stationed at

the Greyhound bus station at 16th and Jackson Streets in Omaha, Nebraska, at approximately 6:30 a.m. (TR. 10). The officers were casually dressed in civilian attire (TR. 38). At that time, the eastbound Greyhound bus from Los Angeles arrived at the station (TR. 10). Since numerous seizures of contraband have been made from this bus in the past, the bus draws particular attention of the commercial interdiction unit (TR. 11). As the bus arrived at the bus station on August 2nd, the bus followed a usual routine, i.e., the bus stopped at the terminal doors and the passengers got off the bus and went into the terminal for a rest break to await the cleaning and refueling of the bus for the onward trip (TR. 11). Next, the bus is driven to the cleaning and refueling station adjacent to the terminal where the bus is cleaned and refueled for the onward trip (TR. 11-12). Once the bus is cleaned and refueled, the bus is driven back to the platform of the terminal for reloading the passengers (TR. 12).

When the bus pulled into the station on August 2nd, Investigator Lutter's attention was drawn to a passenger in the center of the bus who was seated next to a window (TR. 12). The passenger, later identified as Cornell Kennedy, looked down, appeared to see Investigator Lutter, and then stared straight ahead (TR. 12). As Mr. Kennedy got off the bus, he walked in an awkward manner, i.e., he was holding his pants up with his right hand and kept his left hand close to his body as if something was going to fall out of his clothing (TR. 13). Mr. Kennedy walked directly into the terminal and into the men's restroom (TR. 13). Investigator Scott walked into the terminal after Mr. Kennedy while Investigator Lutter continued to observe the remainder of the passengers deboarding the bus (TR. 14). Investigator Lutter then walked inside the terminal and met with Investigator Scott (TR. 14). Investigators Scott and Lutter stood together waiting for Mr. Kennedy to emerge from the restroom (TR. 14). After several minutes, Mr. Kennedy emerged from the restroom, walked through the terminal to a table in front of some vending machines where he met with Coffer (TR. 14-16).

Investigators Lutter and Scott observed Mr. Kennedy and Coffer for approximately fifteen minutes (TR. 36). During that period of time, Mr. Kennedy and Coffer had brief periods of conversation together and sometimes stood apart from each other (TR. 42). During the last five minutes of the investigators observation, Mr. Kennedy and Coffer were seated at the same table, engaged in conversation, and shared some food from the food service counter

2

(TR. 36; 42). As Mr. Kennedy got up from the table and started to walk away, Investigator Scott approached Mr. Kennedy (TR. 17). Simultaneously, Investigator Lutter approached Coffer who was still seated at the table with a small child, a girl of about four years of age (TR. 17).

Investigator Lutter removed a chair from an empty nearby table, turned the chair around, and sat down at Coffer's table, produced his badge and identification card, told Coffer that Coffer was not under arrest or in any kind of trouble, and asked Coffer if he (Investigator Lutter) could speak with coffer (TR. 19; 44). Coffer said yes (TR. 19). Investigator Lutter asked Coffer who the child was, and Coffer told Investigator Lutter the child was his daughter whom he picked up in California (TR. 19). Investigator Lutter asked Coffer if he could see Coffer's tickets, and Coffer produced them (TR. 48-49). Investigator Lutter returned the tickets to Coffer and told Coffer that Investigator Lutter was a law enforcement officer and was watching for people who may be transporting illegal contraband such as guns, drugs, knives, and explosive devices (TR. 19; 50). Investigator Lutter asked Coffer if Coffer had any of those items with him (TR. 20). Coffer stated that he did not (TR. 20). Investigator Lutter pointed at a red soft-sided insulated cooler besides Coffer and asked if he (Investigator Lutter) could search Coffer's luggage and Coffer's person (TR. 20, 24). At the same time, Investigator Scott was talking with Mr. Kennedy who was standing a few feet away from Investigator Lutter and Coffer (TR. 22). Investigator Lutter could hear Investigator Scott ask similar questions of Mr. Kennedy (TR. 23). When asked by Investigator Lutter if Coffer's luggage could be searched, Coffer told Investigator Lutter, "yes, go ahead" (TR. 23). The cooler was sitting on the floor, and Coffer pushed it toward Investigator Lutter, who began to search the cooler by unzipping the zippers and looking into the cooler (TR. 25-26). Investigator Lutter observed there were food products in the cooler and a bundle which appeared to be a white athletic sock about the size of a softball (TR. 26). At this time, Investigator Lutter did not open the sock or determine its contents (TR. 47).

While Investigator Lutter was talking with Coffer, Investigator Scott spoke with Mr. Kennedy (TR. 68). Investigator Scott asked Mr. Kennedy where he was going and was told Cleveland, Ohio (TR. 68). When told by Investigator Scott that Mr. Kennedy appeared to have

something down his pants, Mr. Kennedy said he had nothing there and invited Investigator Scott to look as Mr. Kennedy pulled down his jogging suit and displayed his shorts (TR. 68). Investigator Scott asked Mr. Kennedy if Investigator Scott could search Mr. Kennedy, and Mr. Kennedy said no (TR. 69). Investigator Scott did so anyway and found a rectangular package strapped to Mr. Kennedy's side (TR. 69). Mr. Kennedy was then detained and handcuffed by Investigator Scott (TR. 69).

At the time of the search of Coffer's cooler, Investigator Lutter observed the search of Mr. Kennedy's person by Investigator Scott and the placement of handcuffs on Mr. Kennedy by Investigator Scott (TR. 26). As Investigator Scott was handcuffing Mr. Kennedy, Investigator Scott stated "we have a bundle." (TR. 36). Investigator Lutter then told Coffer he was to be detained because of the investigation of the illegal contraband involving Coffer and Mr. Kennedy, and Investigator Lutter placed handcuffs on Coffer (TR. 27). After placing handcuffs on Coffer, Coffer, his daughter, and the cooler were brought to an office in the bus station (TR. 27). Coffer and his daughter walked while Investigator Lutter carried the cooler (TR. 27). Investigator Plowman also joined them in the office (TR. 29). Upon arrival in the office, Coffer was seated in a chair and Investigator Lutter removed the sock from the cooler (TR. 28). There was white powder in the sock which was field tested as positive for cocaine (TR. 28).

Coffer was orally advised of his *Miranda* rights by Investigator Lutter, and Coffer was told that cocaine was found on Mr. Kennedy (TR. 29). Investigator Lutter asked Coffer if it would be a waste of time for Investigator Lutter to conduct an interview of Coffer (TR. 29). Since Coffer did not ask for an attorney nor did he indicate he did not want to talk with the investigators, Coffer was transported to the NSP offices in west Omaha as was Mr. Kennedy (TR. 30). Coffer's daughter was transported separately to the NSP office where she was later turned over to Child Protective Services (TR. 32). Prior to Coffer's interview, Investigator Lutter participated in an interview of Mr. Kennedy at the NSP office (TR. 34). About an hour later, Coffer was re-advised of his *Miranda* rights at 9:21 a.m. by using a NSP Advice of Rights form, which Coffer signed and initialed at 9:24 a.m. (TR. 31-32; Exhibit 1). The advice of rights and Coffer's interview was videotaped (with audio) (TR. 31-32; Exhibit 2). Coffer

4

agreed to talk with the investigators without an attorney. Coffer admitted his involvement with the possession of the cocaine and informed the investigators of the source of the drugs.

## LEGAL ANALYSIS

Coffer asserts that he was arrested without probable cause in that he was removed from the public area of the bus terminal in handcuffs to a rear office of the bus terminal. Further, Coffer asserts his luggage was searched without consent or probable cause. Coffer asserts that any statements he made after his arrest were the fruit of his previous unlawful arrest and search.

### Encounter with Coffer

Encounters between the police and citizens fall into three general categories:

(1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth Amendment, **see, e.g.,** *Florida v. Bostick*, 501 U.S. 429 (1991); *Florida v. Royer*, 460 U.S. 491 (1983); *United States v. Angell*, 11 F.3d 806 (8th Cir. 1993), **cert. denied**, 512 U.S. 1239 (1994); *United States v. Robinson*, 984 F.2d 911 (8th Cir. 1993); *United States v. Gilbert*, 936 F.2d 377 (8th Cir. 1991);

(2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity, **see, e.g.,** *United States v. Sokolow*, 490 U.S. 1 (1989); *Reid v. Georgia*, 448 U.S. 438 (1980); *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Weaver*, 966 F.2d 391 (8th Cir.), **cert. denied**, 506 U.S. 1040 (1992); *United States v. Galvan*, 953 F.2d 1098 (8th Cir. 1992); and

(3) physical arrests, which must be supported by probable cause. *U.S. Const. amend. IV.*

The issue is whether the first contact between Investigator Lutter and Coffer was a purely consensual encounter or an investigatory detention or seizure. "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry*, 392 U.S. at 19 n.16. A seizure does not occur when a police officer approaches an individual

and merely questions him or asks to examine his identification -- so long as the officer does not convey a message that compliance with his request is required. **Bostick**, 501 U.S. at 434. If "a reasonable person would feel free 'to disregard the police and go about his business,'" the encounter is consensual and no reasonable suspicion is required. *Id*. (**quoting California v. Hodari D.**, 499 U.S. 621, 628 (1991)). "It is well established that law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place . . . [and] putting questions to him if the person is willing to listen." **United States v. Green**, 52 F.3d 194, 198 (8th Cir. 1995) (citations omitted). A request for information does not turn consensual questioning into an investigatory stop. **United States v. Pena-Saiz**, 161 F.3d 1175, 1177 (8th Cir. 1998); **United States v. Poitier**, 818 F.2d 679, 682-83 (8th Cir. 1987), **cert. denied**, 484 U.S. 1006 (1988). Further, as long as Coffer was not selected for an approach for any purely discriminatory reasons, e.g., race or ethnicity, the fact Investigator Lutter chose to observe Coffer and approach him is without constitutional implication.

### Search of the Cooler

Coffer consented to the search of the cooler in which the sock containing the cocaine was found. A consent search must be voluntary. "A search may be constitutionally valid either where it is supported by a reasonable suspicion or by valid consent." **United States v. Morris**, 910 F. Supp. 1428, 1446 (N.D. Iowa 1995) (internal citations omitted). "A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion." **United States v. Meza-Gonzalez,** 394 F.3d 587, 592 (8th Cir. 2005). The Fourth Amendment test for valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances." **Ohio v. Robinette,** 519 U.S. 33, 40 (1996). Some characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests. **United States v. Hathcock**, 103 F.3d 715, 719-20 (8th Cir. 1997). The court can also look at the period of time that the individual was detained;

whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual stood by silently while the search occurred. *Id.* In the present case, no evidence suggests Coffer was threatened, intimidated, or coerced. The consent occurred in a public place after a very brief encounter with Coffer.

### Detention of Coffer

Investigator Lutter detained Coffer following the discovery of the sock and the detention of Mr. Kennedy. While the full nature of the contents of the sock were not known at the time of the discovery of the sock at the table in the public area of the bus terminal, once the sock was found Investigator Lutter had a basis to detain Coffer for further investigation. An investigative detention must be supported by a reasonable articulable suspicion of criminal activity.

> [The Eighth Circuit] has summarized the standards used to consider whether reasonable suspicion exists as follows:
> The standard of articulable justification required by the fourth amendment for an investigative, *Terry*-type seizure is whether the police officers were aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warranted suspicion that a crime was being committed. In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. The totality of the circumstances -- the whole picture -- must be taken into account. We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals. It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which describe a very broad category of predominantly innocent [people].

*United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998) (internal citations and quotations omitted); **see also** *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

In this case, Investigator Lutter discovered the sock in the cooler with food, a highly suspicious event. Further, Coffer was observed in the company or visiting with Mr. Kennedy who was detained with a "bundle" discovered on Mr. Kennedy's person. Even if these facts could be considered lawful, or if the conduct is ambiguous and susceptible to an innocent explanation as well as creating a reasonable suspicion of criminal activity, police officers may detain the individual to resolve the ambiguity. *Wardlow.* 528 U.S. at 125. Additionally, the scope of an investigative detention is not exceeded when the suspect is handcuffed, when such action is a reasonable precaution. *United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999). Consequently, Investigator Lutter was legally justified in detaining Coffer, handcuffing him, and walking him back to the rear office in the bus terminal.

### Probable Cause for Coffer's Arrest

Once Investigator Lutter tested the substance found in the sock and determined by a field reagent test that the substance was cocaine, he had a basis for the arrest of Coffer. The testing of the substance was authorized by the previous consent of Coffer which allowed Investigator Lutter to search the cooler or by the lawful investigative detention previously discussed. The court finds no defect in the arrest of Coffer once the cocaine was found in the sock which was contained in the cooler.

### Coffer's Statement

The touchstone for the admissibility of a defendant's statements is voluntariness. *Brown v. Mississippi*, 297 U.S. 278 (1936). The court must look to the totality of circumstances in determining whether or not the statements were voluntary. *Mincey v. Arizona*, 437 U.S. 385 (1978); *Colorado v. Connelly*, 479 U.S. 157 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). In this case, Coffer was advised of his constitutional rights in pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). This advice was given to

Coffer orally at the bus terminal and in writing at the NSP offices. There is no evidence Coffer did not understand the advice of rights.

Even though Coffer was advised of his *Miranda* rights, the court must examine the conduct of the law enforcement officials to determine whether or not there was an overreaching by law enforcement officials amounting to coercive police activity. Coercive police conduct will render a confession inadmissible. *Blackburn v. Alabama*, 361 U.S. 199 (1960). In determining whether a defendant made statements voluntarily, the court must determine if the accused was coerced or his will was overborne. *United States v. Martin*, 369 F.3d 1046, 1055-56 (8th Cir. 2004). The court must consider the totality of the circumstances, including the specific interrogation tactics employed, the details of the interrogation, and the characteristics of the accused. *Schneckloth*, 412 U.S. at 225-26. Coercive police pressure is a predicate to the finding that the confession is not voluntary and violates the accused's due process rights. *Connelly*, 479 U.S. at 167. However, any police questioning has coercive aspects to it simply by reason of the confrontation. The police officer is part of the law enforcement system that will cause a charge to be made against a suspect. The questioning by a police officer, while uncomfortable, is not coercive *per se*. **See** *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

After a review of the videotape of the interview with Coffer, the court finds there was no coercive police activity to warrant suppression of Coffer's statement. The court finds the statement to be wholly voluntary following a complete advice of constitutional rights. Further, as previously noted, the court does not find the statement to be the product of an illegal search, detention, or arrest of Coffer. Coffer's motion to suppress should be denied.

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM** that Coffer's motion to suppress (Filing No. 13) be denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this

Report and Recommendation. Failure to timely appeal or object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

Dated this 22nd day of April, 2005.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge